IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | |
|---|---|
| Pilgrim's Pride Corporation, | No. 5:22-cv-04413-JDA |
| Petitioner, | |
| v. | **ORDER AND OPINION** |
| Michael Diaz, Jean-Nichole Diaz, Diaz Family Farms LLC, *on their own behalf and on behalf of all others similarly situated*, | |
| Respondents. | |

This matter is before the Court on a petition to Vacate the Clause Construction Award (the "Petition") issued pursuant to the American Arbitration Association's ("AAA") Supplementary Rules for Class Arbitrations. [Doc. 1.] Michael Diaz, Jean-Nichole Diaz, and Diaz Family Farms LLC ("Respondents") filed an Answer and Opposition to the Petition [Doc. 7], and Pilgrim's Pride Corporation ("PPC") filed a reply [Doc. 17]. Respondents filed supplemental authority [Doc. 26], and PPC then filed a reply to the supplemental authority as well as a letter from the arbitrator [Docs. 27; 28]. The Petition is now ripe for consideration.

**BACKGROUND**

On March 29, 2019, PPC, one of the nation's largest poultry companies, contracted with Michael Diaz d/b/a Diaz Family Farms LLC ("Diaz") to raise poultry for PPC to process and sell to customers domestically and internationally. [Doc. 1 at 4.] The contract (the "Agreement") contained the following arbitration provision (the "Arbitration Clause"):

> Arbitration. Except as provided under Subsection xii, all claims between [PPC] and [Diaz] arising out of or relating in

any way to the execution, interpretation and performance of this Agreement and/or its Exhibits, and/or the dealings between [Diaz] and [PPC], shall be submitted to binding arbitration conducted by a single arbitrator to be selected by the parties. If the parties cannot agree on a single arbitrator, then the single arbitrator shall be selected in the following manner: (i) the arbitration shall be conducted by the Dallas office of the [AAA]; (ii) a single arbitrator shall be selected from a list of at least 7 individuals provided by the AAA; (iii) the party demanding arbitration shall make the first, third and fifth strikes from the list; (iv) the second party shall make the second, fourth and sixth strikes; and (v) the remaining individual from the original list of seven shall be the arbitrator. Regardless of whether the parties select the single arbitrator without the assistance of the AAA or whether the AAA conducts the arbitration, the following procedures shall apply:

    i. Either party ([PPC] or [Diaz]) shall demand arbitration in writing within one hundred twenty (120) days after the alleged claim was known or reasonably should have been known by serving a copy of the written demand to the other party. If [PPC] demands arbitration, the written demand shall be provided to [Diaz]. If [Diaz] demands arbitration, the written demand shall be provided to [PPC] by mail to [PPC at a specific address].

    ii. The parties hereby agree that the arbitrator selected shall be a neutral and impartial arbitrator.

    iii. The arbitrator shall be a person having knowledge of or experience with respect to the poultry production industry.

    iv. Each party shall bear its own arbitration costs and expenses, and the costs and expenses of the arbitrator shall be shared jointly and equally between the parties.

    v. The arbitration hearing shall be held within the specified venue or an agreed-to location. At least twenty (20) days advance notice of the hearing date, time and location shall be provided to both parties.

    vi. Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitrator upon a showing of substantial need by the party seeking discovery.

vii. The arbitrator shall have no power to award non-monetary or equitable relief of any sort. The arbitrator shall also have no power to award (a) damages inconsistent with any applicable agreement between the Parties or (b) punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum.

viii. The arbitrator shall hear the evidence and testimony offered by the parties, and the arbitration hearing shall be concluded within ten (10) days from its starting date unless otherwise ordered by the arbitrator. The arbitrator will make a decision within thirty (30) days from the completion of the hearing. Either party may ask for a reasoned award in writing, which shall be provided to the parties. Both parties shall be allowed a period of time to submit post-hearing briefs within a period of time designated by the arbitrator. Any award rendered by the arbitrator shall be final and binding on all parties except as provided by law. Such judgment or award rendered by the arbitrator may be recorded or entered by either party in any court having jurisdiction pursuant to this Agreement.

ix. The parties stipulate that the provisions hereof shall be a complete defense to any suit, action, or proceeding instituted in any federal, state or local court or before any administrative tribunal. The arbitration provisions hereof shall, with respect to any controversy or dispute, survive the termination or expiration of this Agreement and/or its Exhibits.

x. Nothing herein contained shall be deemed to give the arbitrator any authority, power, or right to alter, change, amend, modify, add to or subtract from any of the provisions of this Agreement and/or its Exhibits.

xi. Failure by either party to participate in the arbitration process shall preclude that party from objecting to the arbitration proceedings.

xii. **[DIAZ] MAY DECLINE TO BE BOUND BY ARBITRATION BY COMPLETING THE INFORMATION AND PLACING HIS OR HER SIGNATURES ON PAGE 5**

3

> **OF THE AGREEMENT.** If [Diaz] elects not to be bound by the Arbitration section, [Diaz] and [PPC] can nevertheless agree to arbitrate any and all claims between themselves arising out of or relating in any way to the execution, interpretation and performance of this Agreement and/or its Exhibits by consenting to arbitration in writing after the claim(s) arise.

[Doc. 1-1 at 5 (some emphasis added).] Diaz signed the Agreement next to language indicating that he "accept[ed] the arbitration provisions." [*Id.* at 6 (emphasis omitted).]

Due to an equipment malfunction on the Diaz farm that resulted in thousands of chickens suffocating, PPC requested that Diaz install an alarm on its poultry houses. [Doc. 1 at 6–7.] Diaz refused to do so, however, and PPC terminated the Agreement in September 2019. [*Id*. at 7.]

On March 3, 2022, Respondents initiated arbitration against PPC under the Arbitration Clause. [Doc. 1-3.] In their arbitration demand, filed with the AAA, Respondents asserted claims "on behalf of themselves and … [a]ll individuals who worked as broiler chicken growers for [PPC] in South Carolina at any time during the period March 2, 2019 to the present." [*Id.* at 33 ¶ 95.] Before an arbitrator was appointed, PPC sent a letter to the AAA case manager, objecting to the arbitration proceeding on a classwide basis. [Doc. 1-4.] PPC argued that because the Arbitration Clause is silent as to class arbitration, the Supreme Court's holdings in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), supports a finding that arbitration on a classwide basis is impermissible. [*Id.* at 2.] Additionally, PPC argued that the Supreme Court's holding in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019), supports a finding that an ambiguous arbitration agreement does not provide the necessary contractual basis for classwide arbitration. [*Id.* at 2–3.] PPC contended that "[t]he clear and express language of the

4

[Agreement] does not allow for class arbitration," and, "[i]f anything, the agreement demonstrates that the parties contemplated *only* bilateral arbitration." [*Id.* at 4.] PPC proceeded to list several examples of language from the Agreement that it argued supported its contention. [*Id.*] PPC also emphasized that it had not consented to class arbitration since Respondents' claims arose. [*Id.*] PPC therefore requested written confirmation that the proceeding would not continue forward as a class arbitration. [*Id.* at 5.]

When an arbitrator was appointed, he requested that the parties brief whether the Agreement permitted class arbitration. [Doc. 1-5]; *see* Supplementary Rule 3, AAA Supplementary Rules for Class Arbitrations, https://www.adr.org/sites/default/files/Supplementary_Rules_for_Class_Arbitrations.pdf (last visited Mar. 4, 2024) (("Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class."). In PPC's opening brief, submitted on June 3, 2022, PPC reiterated its arguments that the Agreement did not allow for class arbitration [Doc. 1-6], and "request[ed] that a partial final award be entered construing the [Arbitration Clause] to preclude class arbitration" [*id.* at 11]. Respondents filed a response brief opposing that request on June 17, 2022, and arguing that the Agreement manifests the parties' "agreement that claims like those brought by [Respondents] can be arbitrated on a class basis" because the Arbitration Clause unambiguously demonstrates the parties' agreement to permit class arbitration. [Doc. 1-8.]

5

Following two hearings and several rounds of written submissions from the parties,[1] the arbitrator issued his Partial Final Award–Clause Construction Award on November 7, 2022 (the "Award"). [Doc. 1-15.] In the Award, the arbitrator began his discussion by noting that the "purpose of this proceeding was to determine Clause Construction" about whether "the applicable arbitration clause . . . permits this arbitration to proceed on behalf of a class." [*Id.* at 1–2.] The arbitrator reviewed applicable caselaw, including *Stolt-Nielsen* and *Lamps Plus*, and concluded that "if an arbitration clause is silent or ambiguous regarding the question of whether class arbitration is permitted, there shall be no class arbitration." [Doc. 1-15 at 7–8.] Still, the arbitrator noted jurisprudence subsequent to those two decisions "established that there is a category of arbitration clauses where the clause may not use the precise words of 'class or collective arbitration' or 'joint' or 'consolidated[,'] but class arbitration may still be 'implicit' and permitted upon an analysis of the 'four corners' of the arbitration clause." [*Id.* at 8.]

Construing the Arbitration Clause, the arbitrator determined that the Agreement unambiguously included such an implicit agreement to class arbitration. The arbitrator explained as follows:

> I base my conclusion entirely upon an analysis of the four corners of the [Arbitration Clause], Section 7 of the [Agreement], and specifically for the following reasons:
>
> 1. As noted above, Section 7 of the [Agreement] is highly comprehensive in every respect including the

---

[1] The arbitrator held a preliminary conference on July 8, 2022, then, on July 11, 2022, instructed the parties to submit additional submissions and set another hearing. [Doc. 1-9.] After the parties made their submissions on July 29, 2022 [Docs. 1-10; 1-11], and the arbitrator held a second hearing, the arbitrator, on August 16, requested additional briefing, which the parties provided [*see* Docs. 1 at 8; 7 at 9]. On October 6, 2022, the arbitrator requested a third round of submissions [Doc. 1-12], which the parties provided on October 18, 2022 [Docs. 1-13; 1-14].

6

commencement of the arbitration.  It is not reasonable to conclude that parties who signed an arbitration agreement which is so highly comprehensive in every other respect were either silent or remained ambiguous regarding the nature of procedural devices including class arbitration which could be used to initiate the adjudication of disputes between them.  Rather, the comprehensive nature of Section 7 leads to the conclusion that all disputes - no matter how initiated - are to be adjudicated by use of the detailed arbitration provisions.

2. The [Arbitration Clause] commences with the words "Except as provided in subsection XII."  Subsection XII provides that Claimants, [Diaz], has an option to decline to be bound by arbitration.  The fact that the [Arbitration Clause] sets forth an option for a total exclusion from arbitration means the parties understood they could have set forth other exclusions such as class arbitration.

3. The [Arbitration Clause] goes on to state that "all claims" between [PPC] and [Diaz] are subject to arbitration.  [PPC] argues that the word "Claims["] is narrower than the language of other cases which often refer to all "claims, controversies or disputes[."]  However, Section 7(IX) clearly states that "the arbitration provisions hereof shall, with respect to any controversy or dispute, survive the termination or expiration of this Agreement and/or its exhibits."  Clearly, the word "Claims" is intended to include "any controversy or dispute[."]  Otherwise, it would not be the "arbitration provisions hereof" and there would [be] no need for a clause stating that such "controversy or dispute" survives.  As such, the language of Section 7 is the most comprehensive type including claims, controversies and disputes.

4. The [Arbitration Clause] goes on to state that the arbitration may adjudicate all claims "arising out of or relating in any way to the execution, interpretation and performance of the Agreement and its exhibits, and/or dealings between [Diaz] and [PPC]."  It is hard to imagine any form of claim, controversy or dispute, regardless of what procedural device is used to initiate such dispute, which would not fall within this broad language.  It is harder to imagine broader language than the words "<u>all</u>" claims and "<u>arising out of or relating in any way to</u>" regardless of the procedural devi[c]e used to initiate an adjudication of such claims.  Certainly, the claims set forth in the Demand do fall within the broad language of the arbitration clause.

7

5. The [Agreement] not only deals with the particular transactions which are the subject of the [Agreement] but it is so broad that it includes "the dealings between [Diaz] and [PPC]." This means that disputes outside of the [Agreement] contractual relationship would also be covered by arbitration. This again leads to the conclusion that a procedural device such as class arbitration which includes disputes that affect other signators of the same [Agreement] agreement is also the subject of arbitration even if such dispute has nothing to do with the [Agreement] but "arise out of or relate in any way" to the "dealings" between the parties.

6. Section 7(IX) further emphasizes the breadth of the arbitration clause. The first sentence of Section 7(IX) states that "…the provisions hereof shall be a complete defense to any suit, action, or proceeding instituted in a federal, state or local court or before any administrative tribunal." The plain meaning of this clause is to prohibit any proceeding in any other forum, including all courts and administrative tribunals. The import is clear – all disputes, no matter the nature of the claim or the nature of the procedural device used to initiate the claim – go to arbitration.

7. Unusually, the [Arbitration Clause] states that the provisions "with respect to any controversy or dispute, survive the termination or expiration of this contract and/or its exhibits." As such, the parties agreed that even if some dispute arises related to their dealings that has nothing to do with the [Agreement] and even if it takes place after the [Agreement] has expired, that dispute is to be sent to arbitration. Again, there can be little doubt that the intention of the parties was that all claims, controversies and disputes, no matter how they were initiated must go to arbitration.

Based upon the above analysis, it is hard to imagine an arbitration clause which, while not using the explicit words of "class[,]" "collective[,]" "joint" or "consolidated" could be more explicit in indicating that all disputes, regardless of whatever procedural device is used to bring on such dispute must be heard and adjudicated in arbitration. The use of the words "all[,]" "arising out of or relating in any way[,]" the inclusion of all "claims, controversies and disputes[,]" the "complete defense" to all proceedings in a court or administrative tribunal, the inclusion of disputes which may be unrelated to the [Agreement] but deal with the "dealings" of

8

> the parties, the survival of the arbitration clause after the [Agreement] expires, and the highly comprehensive nature of the arbitration clause all lead to the conclusion that Section 7 of the [Agreement] allows this matter to proceed as a class certification.

[Doc. 1-15 at 9–12.]

The arbitrator also discussed and explained why he distinguished *Grant v. Chevrolet*, 847 S.E.2d 806 (S.C. 2020), on which PPC had heavily relied. [Doc. 1-15 at 12–14.] In *Grant*, the court concluded that the arbitration clause at issue did not permit class arbitration because nothing in the relevant agreement indicated that both parties consented to class arbitration. *Grant*, 847 S.E.2d at 809. Here, the arbitrator found the one-paragraph arbitration clause at issue in *Grant* "was far less comprehensive and different from" the Arbitration Clause in this case. [Doc. 1-15 at 14; *see id.* at 12–14.]

For these reasons, the arbitrator determined that the arbitration clause permits the arbitration to proceed on behalf of a class. [*Id.* at 15.] He then stayed the arbitration proceedings for a period of at least 30 days under AAA Supplementary Rule 3 to permit the parties to move a court of competent jurisdiction to confirm or vacate the Award. [*Id.*]; Supplementary Rule 3 ("The arbitrator shall stay all proceedings following the issuance of the Clause Construction Award for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or to vacate the Clause Construction Award.").

PPC's Petition to this Court followed. [Doc. 1.]

## APPLICABLE LAW

The Federal Arbitration Act applies to all contracts that both involve commerce and reflect a written agreement to submit any controversy to arbitration. 9 U.S.C. § 2.

Importantly, judicial review of an arbitration award is extremely limited, and is, in fact "among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998) (footnote omitted).  Accordingly, a court's review of an arbitration award "is limited to determining whether the arbitrator[] did the job [he was] told to do—not whether [he] did it well, or correctly, or reasonably, but simply whether [he] did it." *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994) (internal quotation marks omitted).

The FAA permits vacatur of an arbitration award by a reviewing court on only four grounds:  (1) "the award was procured by corruption, fraud, or undue means"; (2) "there was evident partiality or corruption in the arbitrator[]"; (3) the arbitrator committed certain "misconduct" or "misbehavior" in conducting the arbitration; or (4) the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a).  In addition to these four grounds, the Fourth Circuit has held that a reviewing court may vacate an arbitration award upon a showing of certain common law grounds, including "those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006).

## **DISCUSSION**

**The Parties' Arguments**

In seeking vacatur of the Award, PPC contends that that the arbitrator created his own standard for evaluating the Arbitration Clause that is "contrary to the governing principles espoused in the FAA and binding Supreme Court legal opinions, as well as the only South Carolina appellate opinion on point." [Doc. 1 at 9.] PPC further argues that "the Court, rather than the arbitrator, must decide whether the parties agreed to class arbitration since the parties' arbitration agreement did not delegate this issue of arbitrability to the arbitrator." [*Id*. at 11.] And PPC maintains that even if the arbitrator was authorized to decide this issue, "the Award should be vacated because (1) the arbitrator exceeded his powers, (2) the Award evidences a manifest disregard of the law, and (3) the Award fails to draw its essence from the Agreement." [*Id*. at 11–12; *see id.* at 13–20.]

In opposing PPC's Petition, Respondents argue that to the extent PPC now argues that the question of whether the parties agreed to class arbitration is one for the Court rather than the arbitrator, that "argument is long since waived" given that PPC willingly and without reservation allowed the issue to be submitted to the arbitrator. [Doc. 7 at 10–11.] Respondents alternatively contend that, even were the issue not waived, the Agreement assigns the question of class arbitrability to the arbitrator. [*Id.* at 12–14.] Finally, given the extremely narrow standard of review applicable to the arbitrator's decision, Respondents argue that the arbitrator's decision that the Agreement permits arbitration on behalf of a class should not be vacated even if the Court concludes that the decision was in error. [*Id.* at 14–25.] Respondents particularly direct the court to the

11

Supreme Court's holding in *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013), as instructive in this matter. [*Id*. at 19–21.]

**The argument that class arbitrability was an issue for the Court has been waived**

The Court begins by addressing PPC's argument that the question of whether the Agreement permits class arbitration should have been made by a court in the first instance rather than by the arbitrator. The Court agrees with Respondents that PPC waived that argument by failing to raise it before the arbitrator.

When "a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter." *Env't Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, 606 (7th Cir. 2008) (internal quotation marks omitted); *see Ribadeneira v. New Balance Athletics, Inc.*, 65 F.4th 1, 15 (1st Cir. 2023) (stating that an objection to arbitrability "must be made on a timely basis, or it is waived"). In contrast, if "a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court."[2] *Env't Barrier Co.,* 540 F.3d at 606–07 (internal quotation marks omitted).

In this case, even before an arbitrator was assigned, PPC argued that the Agreement did not permit class arbitration and maintained that this case should proceed as bilateral arbitration only. [Doc. 1-4.] PPC proceeded to address this issue in several written submissions to the arbitrator [Docs. 1-6; 1-10; 1-13] and two hearings. However,

---

[2] The court in *Environmental Barrier Co.* noted that "[a]nyone who wants to object to arbitrability is entitled to make her position known to the arbitrator and the other party; the other party may then, if it wishes, respond with a petition for an order to compel under the [FAA], 9 U.S.C. § 4, and obtain a judicial determination on arbitrability." 540 F.3d at 606.

12

at no point did PPC contend that the arbitrator was not the appropriate person to decide the issue of class arbitrability. Rather, PPC repeatedly requested that the arbitrator decide the issue. [*E.g.*, Doc. 1-6 at 11 ("PPC requests that a partial final award be entered construing the [Agreement's] arbitration clause to preclude class arbitration.").] It was only after the arbitrator issued a decision that PPC did not agree with that PPC argued, for the first time in the instant Petition, that class arbitrability was an issue for the Court rather than the arbitrator in the first instance. But PPC "simply cannot wait until it receives a decision with which it disagrees before challenging the arbitrator's authority." *OMG, L.P. v. Heritage Auctions, Inc.*, 612 F. App'x 207, 212 (5th Cir. 2015); *see also Oxford Health Plans*, 569 U.S. at 569 n.2 (noting that because the party seeking to vacate the arbitrator's decision had agreed that the arbitrator should determine whether its contract authorized class arbitration, the Court would not consider de novo whether the contract authorized class arbitration); *Richmond, Fredericksburg & Potomac Ry. Co. v. Transp. Commc'ns Int'l Union*, 973 F.2d 276, 280 (4th Cir. 1992) ("From the outset, . . . RF&P proceeded on the assumption that the parties had empowered the arbitrator to consider the [issue]; . . . . [It] will not now be heard to challenge the arbitrator's authority to resolve that issue."). The Court thus concludes that any argument that the arbitrator lacked authority to decide the issue in the first instance is waived.

**The arbitrator did not exceed his authority, nor did the award fail to draw its essence from the Agreement.**

As noted, PPC argues that the arbitrator exceeded his powers under 9 U.S.C. §10(a)(4) and that his award fails to draw its essence from the Agreement. [Doc. 1 at 12–17, 19–20.] The Court disagrees.

13

"A party seeking relief under [9 U.S.C. § 10(a)(4)] bears a heavy burden. It is not enough to show that the arbitrator committed an error—or even a serious error." *Oxford Health Plans*, 569 U.S. at 569 (cleaned up). Rather, "[b]ecause the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's review of its (de)merits." *Id.* (internal quotation marks omitted). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Stolt-Nielsen*, 559 U.S. at 671 (alterations in original). Accordingly, the "sole question" for a reviewing court under 9 U.S.C. § 10(a)(4) "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans*, 569 U.S. at 569. Similarly, "[a]n arbitration award fails to draw its essence from an arbitration agreement when the award reflects merely the arbitrator's personal notions of right and wrong or the arbitrator's words manifest an infidelity to the agreement." *Advantage Veterans Servs. of Walterboro, LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers, Int'l, Local 7898*, 70 F.4th 751, 756 (4th Cir. 2023) (internal quotation marks and citation omitted). The Fourth Circuit has explained that "an arbitration award does not fail to draw its essence from the agreement merely because a court concludes that an arbitrator has misread the contract." *Patten*, 441 F.3d at 235 (internal quotation marks omitted). Rather, "[a]n arbitration award fails to draw its essence from the agreement only when the result is not rationally inferable from the contract." *Id.* (internal quotation marks omitted).

The arbitrator in this case carefully explained his conclusion that the applicable caselaw demonstrates that an arbitration clause may allow for class arbitration if it unamibiguously demonstrates that the parties implicitly agreed to class arbitration, even if the agreement "does not set forth magic words such as 'class[,'] 'collective[,'] 'joint[,'] or 'consolidated.'"  [Doc. 1-15 at 7–8, 12–14.]  The arbitrator then provided a detailed explanation—referencing both the text and structure of the Agreement—of why he interpreted the Agreement as unambiguously demonstrating that the parties agreed to class arbitration.  [*Id.* at 9–14.]  Such an analysis, regardless of whether it is erroneous, or even seriously so, was "through and through, [an] interpretation[] of the parties' agreement."  *Oxford Health Plans*, 569 U.S. at 570.  Given the arbitrator's thorough discussion of why he construed the Agreement to unambiguously permit class arbitration, the Court "would have to rely on a finding that he misapprehended the parties' intent" in order to overturn his decision, and the applicable standard of review does not allow vacatur on that basis.[3]  *Id.* at 571.  Rather, "[t]he arbitrator's construction holds, however good, bad, or ugly."  *Id.*

---

[3] PPC offers many reasons why it believes that the arbitrator's reading of the Agreement is flawed.  [Doc. 1 at 12 (arguing that the arbitrator exceeded his powers because "if an arbitration agreement does not *specifically* authorize class arbitration, an arbitrator exceeds his powers if he nevertheless holds that class arbitration is authorized" (emphasis added); *id.* at 13 (arguing that the parties did not implicitly agree to class arbitration because "the arbitration provision *expressly forbids* the arbitrator from adding any rights or procedural devices to the Agreement"); *id.* at 13–14 (contending that "[t]he bilateral nature of the arbitration provision is readily apparent from its plain language"); *id.* at 14 (contending that the arbitrator did not look to the FAA or Supreme Court or South Carolina precedent to determine the parties' intent and that the arbitrator's decision was at odds with *Stolt-Nielsen*); *id.* at 15–16 (arguing that the arbitrator improperly relied on the comprehensiveness of the Agreement in finding that the parties implicitly agreed to class arbitration); *id.* at 16 (arguing that the arbitrator inferred from the parties' agreement to bilateral arbitration that they agreed to class arbitration).]

15

Attempting to show something more than a serious legal error, PPC suggests that the arbitrator acknowledged both that the Agreement was "silent" regarding class arbitration and that an agreement silent on that subject would not permit class arbitration. [Doc. 1 at 13.] The term "silent" in this context can be traced to the Supreme Court's decision in *Stolt-Nielsen*, in which the Court noted that "the parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration." 559 U.S. at 673. The Court in that case "vacated the arbitrators' decision approving class proceedings because, in the absence of [an agreement to permit class arbitration], the arbitrators had 'simply … imposed [their] own view of sound policy.'" *Oxford Health Plans*, 569 U.S. at 567 (quoting *Stolt-Nielsen*, 559 U.S. at 672). In contrast to the facts in *Stolt-Nielsen*, in this case, the arbitrator did *not* find the Agreement "silent" in the sense that that *Stolt-Nielsen* used that term. Rather, the arbitrator construed the Agreement as demonstrating the parties' unambiguous agreement to permit class arbitration. [Doc. 1-15 at 9–12.] With the arbitrator having actually completed his task of interpreting the Agreement, § 10(a)(4) does not permit vacatur of his decision because he performed the task "poorly." *Oxford Health Plans*, 569 U.S. at 572–73. Accordingly, PPC is not entitled to vacatur of the Award on the basis that the arbitrator exceeded his authority or that the award did not draw its essence from the Agreement. *Id.* at 573 (explaining that as long as an "arbitrator (even arguably) interpreted the parties' contract," his decision "draw[s] its essence from the contract" regardless of whether it is correct).

**The arbitrator's decision did not evince manifest disregard of the law**

The Court also concludes that PPC has not shown that the Award evinces a manifest disregard of the law. To vacate an arbitration award based on manifest disregard

16

of the law requires a showing that the arbitrator was "aware of the law, understood it correctly, found it applicable to the case before [him], and yet chose to ignore it in propounding [his] decision." *Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008) (alterations in original) (internal quotation marks omitted). This standard is not satisfied unless "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed that legal principle." *Id.* (internal quotation marks omitted).

In arguing that this standard is met, PPC relies on some of the same arguments that it contends demonstrates that the arbitrator exceeded his authority. [Doc. 1 at 17–18.] PPC maintains that the arbitrator understood "that a party may not be compelled to arbitrate on a classwide basis when the [arbitration] provision is silent . . . on the availability of such arbitration" and yet the arbitrator "proceeded to disregard the law." [*Id.*] However, the Court has already explained in the prior section why the arbitrator's reasoning on this point is not inconsistent in the way that PPC suggests. PPC also argues that the arbitrator manifestly disregarded the law by ruling that the parties implicitly agreed to arbitrate on a classwide basis when in fact the Agreement provides that "'the arbitrator does not have 'any authority, power, or right to alter, change, amend, modify, add to or subtract from any of the provisions of' their arbitration agreement." [*Id.* at 18.] However, PPC has not shown that the arbitrator would have viewed himself as *adding* to the provisions of the Agreement. Rather, he purported to construe the provisions to which the parties agreed.

In sum, the Court cannot conclude that the arbitrator "knowingly ignored applicable law when rendering his decision." *Long John Silver's*, 514 F.3d at 351–52. Thus,

regardless of whether the arbitration's application of the law was incorrect here, his decision did not evince manifest disregard of the law.  .

## **ORDER**

Based on the above, the Court DENIES the Petition to Vacate the Clause Construction Award [Doc. 1].

IT IS SO ORDERED.

s/ Jacquelyn D. Austin
United States District Judge

March 11, 2024
Columbia, South Carolina